#30343-r-PJD
**2024 S.D. 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

    v.

MARK WALDNER, and
MICHAEL M. WALDNER, JR.,                  Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BRULE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRUCE V. ANDERSON
Judge

* * * *

JEREMY LUND of
Siegel, Barnett and Schutz, LLP
Aberdeen, South Dakota                    Attorneys for appellant E.H.


MARTY J. JACKLEY
Attorney General

CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellant State of South
                                          Dakota.

* * * *

                                          ARGUED
                                          MARCH 20, 2024
                                          OPINION FILED **11/13/24**

* * * *

KENT E. LEHR
Scotland, South Dakota

Attorney for defendant and appellee Mark Waldner.


TIMOTHY R. WHALEN
Lake Andes, South Dakota

Attorney for defendant and appellee Michael M. Waldner, Jr.

#30343

DEVANEY, Justice

[¶1.]        Michael Waldner, Jr., and Mark Waldner (Waldners) were indicted in Brule County, South Dakota, on varying degrees of rape and sexual contact involving E.H., a minor less than sixteen years of age.  During the investigation, law enforcement obtained a journal written by E.H. detailing the alleged misconduct.  After receiving the journal through discovery, the Waldners sought other journals and diaries written by E.H. through a subpoena duces tecum.  E.H. moved to quash the subpoena.  The circuit court denied the motion to quash and ordered E.H. to produce her other journals and/or diaries for an in-camera inspection by the court.  E.H. filed a petition for an intermediate appeal to this Court.  We granted the petition and instructed the parties to address jurisdiction in addition to the claims relating to the circuit court's order.  We reverse and remand.

## Factual and Procedural Background

[¶2.]        The Waldners were charged by indictment on July 30, 2021, with various crimes against E.H. occurring between January 2019 and December 2020.  Specifically, Mark was charged with one count of rape in the second degree (SDCL 22-22-1(2)), two counts of rape in the fourth degree (SDCL 22-22-1(5)), and one count of sexual contact with a child under sixteen years of age (SDCL 22-22-7).  Michael, Jr., was charged with one count of rape in the second degree (SDCL 22-22-1(2)), one count of aggravated assault (SDCL 22-18-1.1(5)), two counts of rape in the fourth degree (SDCL 22-22-1(5)), one count of sexual contact with a child under

-1-

sixteen years of age (SDCL 22-22-7), and one count of simple assault (SDCL 22-18-1(5)).[1]

[¶3.]     The Waldners and E.H. are members of a Hutterite colony in rural Brule County, South Dakota. After E.H. reported the incidents, she was moved to a sister colony. At her new colony, E.H. was under the care of Adam and Levi Wipf, educators and leaders at the colony. Eventually, E.H. began to confide in Adam and Levi, who accompanied her to speak to law enforcement about the alleged misconduct. While talking to law enforcement, E.H. disclosed that after the incidents with the Waldners, she had written journal entries detailing the events and her experiences. Thereafter, she provided one of her journals to Adam and asked him to provide it to law enforcement. Levi then provided it to DCI Agent Brian Larson.

[¶4.]     Shortly after the charges were filed, the State provided discovery to the Waldners, including police reports, E.H.'s interview with Child's Voice, E.H.'s medical and mental health records, photographs of E.H., and a copy of the pages from E.H.'s journal that had been provided to law enforcement. Following this initial discovery, the State requested a protective order concerning the information contained in these materials. The circuit court granted the protective order on December 8, 2021. However, before the court entered its order, Michael Waldner, Sr., sent an email to leaders and members of other colonies disparaging E.H. and

---

1.     Michael Waldner, Sr., was also charged with rape in the fourth degree and sexual contact with a child under sixteen, but after this appeal was filed, he died on November 5, 2023. By stipulation of all the parties and E.H., the circuit court entered an order dismissing him as a defendant in his pending case and dismissing him as a defendant/respondent in this appeal.

disclosing personal and sensitive information contained within the discovery materials.

[¶5.]		On April 8, 2022, the Waldners filed a motion for further discovery with requests that included any and all disciplinary records from the colony relating to E.H. and "[a]ll of E.H.'s diaries and/or journals." The Waldners argued that "E.H. has made extensive diaries and/or journals which disclose her thoughts, feelings, events, fantasies, and other information which is relevant to the allegations made against the [Waldners], are relevant to E.H.'s credibility, and may be used to impeach her testimony at trial."[2] The Waldners also issued subpoenas duces tecum to Adam and Levi Wipf seeking "diaries, journals, or other documents of any nature" that E.H. had written from "the time period of January 1, 2010, through the present."

[¶6.]		Pursuant to the subpoena, Levi appeared at a June 7, 2022 motion hearing with documents and pictures requested in the subpoenas. However, during testimony provided at this hearing, Levi stated that neither he nor Adam had possession of E.H.'s other journals and indicated that they were in E.H.'s possession. Additionally, he described how difficult the investigation had been on

---

2.	Prior to this motion, the circuit court granted the Waldners' request for a mental health expert to assist in their defense. Their request was based, in part, on their contention that disclosures in E.H.'s journal and her mental health diagnoses suggest she may be "prone to fantasies and hallucinations" that affect her ability to accurately recall events and her overall credibility. In conjunction with granting their request for a mental health expert, the court also granted the Waldners' request for the disclosure of E.H.'s mental health records to share with their expert, subject to a protective order.

E.H. and how the email sent from Michael, Sr. circulated on social media and caused E.H. a tremendous amount of distress.

[¶7.]    At the same hearing, the State clarified that it did not have any other journals and argued that the proper procedure for obtaining them was through a subpoena duces tecum directed to E.H. that satisfied the requirements established in this Court's decision in *Milstead v. Johnson* (*Milstead II*), 2016 S.D. 56, 883 N.W.2d 725. The State also asserted that issuing the subpoena to E.H. would allow her the opportunity to secure counsel. Over the State's objection, the court granted the discovery motion and ordered the State to acquire the journals and provide them to the court for an in-camera inspection. The court also ordered the State to submit an index containing any assertions of privilege, as well as a brief setting forth the State's position why disclosure to the defense should not be permitted. It further directed the State to advise E.H. of her right to seek counsel to help her assert her Marsy's Law rights. After the court's oral ruling, the Waldners issued a subpoena duces tecum directed to E.H. to gain access to her "diaries, journals, or other documents of any nature" that she had written from 2010 to the present. A few days later, the court entered its written order memorializing its oral ruling granting the Waldners' motion for discovery of all of E.H.'s diaries and/or journals.

[¶8.]    E.H. thereafter retained an attorney and, with her attorney's assistance, filed a motion to quash the Waldners' subpoena duces tecum which included a supporting brief asserting her right to privacy and her right to refuse a discovery request under South Dakota Constitution, article VI, § 29 (Marsy's Law). She further argued that the Waldners' subpoena duces tecum did not satisfy the

three-part test set out in *United States v. Nixon*, 418 U.S. 683, 700, 94 S. Ct. 3090, 3103, 41 L. Ed. 2d 1039 (1974), that must be satisfied to obtain production of documents pursuant to a Rule 17(c) subpoena.[3]  However, before the court heard or ruled on the motion to quash, the Waldners withdrew the subpoena they had issued to E.H., noting that they had since been granted access to the journals through the court's discovery order entered after the June 7 hearing.

[¶9.]        E.H. then filed a motion to vacate this discovery order.  In her supporting brief, E.H. argued that the order for further discovery was improper because it violated her due process rights set forth in Marsy's Law.  Specifically, E.H. noted her right to notice of the hearing on the matter and her right to appear and be heard before the court issued an order affecting her rights.  As to the merits of the order, she argued that it was not supported by either the discovery statutes in SDCL chapter 23A-13 or the *Brady* doctrine because the State did not possess the documents at issue.  She also reasserted her right to privacy under Marsy's Law, including the right to refuse discovery requests.

[¶10.]       At a hearing on the motion to vacate, E.H. reiterated her arguments set forth in her brief and also asserted that the only mechanism for seeking to obtain the journals was through a subpoena duces tecum.  She further noted that there are separate arguments that would apply to whether such a subpoena should be quashed, but those were not yet at issue because the Waldners had withdrawn their previously issued subpoena.

---

3.    Rule 17(c) is the federal counterpart to SDCL 23A-14-5, the statute under which the Waldners issued their subpoena.

[¶11.]     In response, the Waldners argued E.H. waived her right to privacy by providing one of her journals to law enforcement and cited this Court's decision in *State v. Karlen*, 1999 S.D. 12, 589 N.W.2d 594, as support. The court took the matter under advisement and at a later hearing, announced its decision regarding the motion to vacate. The court stated that its prior discovery order was improper and explained to the parties, "I can't order [the State] or the DCI to go and fetch these diaries or journals. You have to subpoena them from a third party." The court therefore vacated its prior discovery order "without prejudice to the defendants' right to subpoena the records under the proper process."

[¶12.]     The Waldners then reissued their subpoena duces tecum to E.H. seeking "[a]ny and all statements, notes, video tapes, recordings, photographs, emails, text messages, computer maintained records, electronic records, social media records or recordings, diaries, journals, or other documents of any nature" in E.H.'s possession or control for "the time period of January 1, 2010, through the present." E.H. once again filed a motion to quash the subpoena, citing the same arguments made in her previous motion and brief.

[¶13.]     At a hearing on E.H.'s motion, E.H. primarily argued to the court that the subpoena was "unreasonable and oppressive" and did not satisfy the elements of *Nixon*, and that she had an absolute constitutional right to refuse discovery pursuant to Marsy's Law. E.H. also asserted that she did not waive her right to privacy by turning one of her journals over to law enforcement. The State advised the court that it supported E.H.'s motion to quash.

[¶14.]     In response, the Waldners argued that they had "rights . . . to a fair and impartial and just trial" and that their rights outweighed E.H.'s. The Waldners asserted that it was proper for the journals to be reviewed by the court in-camera to "make a determination as to whether or not . . . they're something that should be disclosed further to the defendants." They suggested this process would maintain E.H.'s right to privacy. The Waldners further argued that E.H. had waived her right to privacy when she wrote in the journal that she provided to law enforcement, "Really, I don't care anymore who reads it. I don't care what they think." The Waldners contended this was a clear "relinquishment of any privacy right in these journals."

[¶15.]     After considering the parties' arguments and balancing E.H.'s privacy rights with the Waldners' rights to a fair trial, the court denied the motion to quash. The court ordered "that all journals or diaries be delivered to the [c]ourt for an in-camera inspection within ten days." The court filed its findings of facts and conclusions of law and its order denying the motion to quash, and a notice of entry of the order was filed on April 28, 2023. E.H. filed a motion to stay the court's order denying the motion to quash while her anticipated appeal was pending, and the court granted the stay.

[¶16.]     E.H. then petitioned this Court for an intermediate appeal on May 8, 2023, seeking review of the circuit court's order denying her motion to quash. The State submitted a response joining E.H.'s petition. We granted E.H.'s petition and instructed the parties to "also brief the question of whether this Court has

jurisdiction to hear an appeal from an interlocutory order brought by the alleged victim in a criminal case."

[¶17.] E.H.'s petition presents the following issues on appeal:

1. Whether this Court has jurisdiction to hear the appeal.

2. Whether the circuit court erred by requiring E.H. to produce her diaries and journals.

## Analysis

### *1. Whether this Court has jurisdiction to hear the appeal.*

[¶18.] "Questions of jurisdiction are legal questions reviewed under a de novo standard." *State v. Bettelyoun*, 2022 S.D. 14, ¶ 16, 972 N.W.2d 124, 128−29 (citation omitted). Further, "[i]ssues of constitutional and statutory interpretation are . . . subject to de novo review." *In re Implicated Individual*, 2023 S.D. 16, ¶ 11, 989 N.W.2d 517, 521.

#### *a. Right to appeal under Marsy's Law*

[¶19.] Under Article VI, § 29:

> The victim, the retained attorneys of the victim, a lawful representative of the victim, or the attorney of the government, upon request of the victim, may assert and seek enforcement of the rights enumerated in this section and any other right afforded to a victim by law in any trial or *appellate court*, or before any other authority with jurisdiction over the case, *as a matter of right.*

(Emphasis added.) This provision clearly affords crime victims the opportunity to seek enforcement of their rights from this Court. However, the provision does not specify, nor have we had the occasion to determine, what the proper procedure is for seeking appellate review for the rights delineated in Marsy's Law. The State

nevertheless asserts that Marsy's Law created a self-executing right to appeal for victims seeking to enforce the rights delineated in this constitutional provision.

[¶20.]     This Court has explained that a constitutional provision is "self-executing when no legislation is necessary to give it effect." *Kneip v. Herseth*, 87 S.D. 642, 655, 214 N.W.2d 93, 100 (1974). We have further stated that "[a] constitutional provision may be said to be self-executing if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *State v. Bradford*, 12 S.D. 207, 80 N.W. 143, 144 (1899) (citation omitted); *see also* 16 Am. Jur. 2d *Constitutional Law* § 105 (providing that a constitutional provision is self-executing "if the nature and extent of the right conferred . . . [is] fixed by the constitution itself . . . and there is no language indicating that the subject is referred to the legislature for action"); 16 C.J.S. *Constitutional Law* § 129.

[¶21.]     Applying these principles, the State notes that the right to appeal accorded by Marsy's Law does not expressly or impliedly *require* additional legislation before such right may be enjoyed and protected. Rather, "[t]he Legislature, or the people by initiative or referendum, *have the authority* to enact substantive and procedural laws to *further* define, implement, preserve, and protect the rights guaranteed to victims by this section." S.D. Const. art. VI, § 29 (emphasis added). Therefore, the State argues that the reference to the Legislature being able to *further* define the rights indicates "that the enumerated rights,

-9-

enforcement mechanisms, and remedies referenced within the provision are self-executing."[4]

[¶22.]	Here, the plain language of Marsy's Law creates a constitutional right for a victim to seek enforcement of certain rights in any trial or appellate court, and it directs the "court or other authority with jurisdiction [to] act promptly on such a request, affording a remedy by due course of law for the violation of any right." Marsy's Law does not, however, grant a victim party status in a criminal case, nor does it specify the procedural steps regarding when or how a victim may appeal to this Court.[5] Therefore, notwithstanding the lack of an express requirement in

---

4.	The State compares South Dakota's Marsy's Law to the victims' rights provisions in other states, which, unlike South Dakota's, contain express language requiring legislative enactments to enforce the provisions. *See, e.g.*, *State v. Skipwith*, 123 A.3d 104, 107 (Conn. App. Ct. 2015) (interpreting a constitutional provision that expressly directed its legislative body to provide laws to enforce a victim's rights contained therein); *State v. Nebraska Bd. of Pardons*, 620 N.W.2d 763, 769 (Neb. 2001) (holding that no remedy was available to a victim's surviving spouse and daughter because the constitutional provision expressly states that there are no other remedies except those specifically provided by the legislature to enforce crime victims' rights).

5.	The Florida Court of Appeals, when considering an identical Marsy's Law provision providing a victim an appeal of right, determined that "a victim's legally cognizable interest in a criminal proceeding does not also automatically entitle a victim to party of record status." *L.T. v. State*, 296 So. 3d 490, 497 (Fla. Dist. Ct. App. 2020). The court recognized that nonparties are nevertheless "routinely granted standing in a criminal setting for the limited purpose of asserting and protecting specific rights." *Id.* When grappling with the manner in which a victim could obtain appellate review, the court observed that Marsy's Law "does not provide procedures to implement and enforce the victim's rights" or "remedies for failure to recognize those rights." *Id.* at 499. The court further noted that it did not "have the authority to craft rules" for such implementation and deemed that to be a task for the legislature. *Id.* at 499–500. The court nevertheless

(continued . . .)

Marsy's Law directing the Legislature to enact statutes to allow for implementation and enforcement of victims' rights, we decline to hold that the right to appeal under Marsy's Law is self-executing.

### b. Jurisdiction via a discretionary appeal

[¶23.] E.H. asserts that *Milstead v. Smith* (*Milstead I*), 2016 S.D. 55, 883 N.W.2d 711, and *Milstead II*, 2016 S.D. 56, 883 N.W.2d 725 "stand for the premise that when a non-party to a criminal proceeding seeks to appeal the denial of a motion to quash, the appropriate method to appeal is a petition for intermediate appeal." In the *Milstead* cases, the third-party sheriff petitioned this Court for permission to file intermediate appeals challenging the circuit court's denial of his motions to quash subpoenas directing the production of documents from officer personnel files. *Milstead I*, 2016 S.D. 55, ¶ 5, 883 N.W.2d at 715; *Milstead II*, 2016 S.D. 56, ¶ 5, 883 N.W.2d at 729. This Court granted both petitions. However, we did not note or address any jurisdictional issues. Thus, our decisions in the *Milstead* cases do not resolve the jurisdictional question at issue here.

[¶24.] Aside from her reliance on the *Milstead* cases, E.H. further asserts that this Court has jurisdiction to hear her appeal under SDCL 23A-32-12. This statute provides, in part:

> As to any intermediate order made before trial, as to which an appeal is not allowed as a matter of right, either *the state or the defendant* may be permitted to appeal to the Supreme Court, not as a matter of right, but of sound judicial discretion, such appeal to be allowed by the Supreme Court only when the court

_____

(. . . continued)
    considered the merits of the appeal, treating the victim's petition for a writ of prohibition as a petition for a writ of certiorari. *Id.* at 496.

> considers that the ends of justice will be served by the
> determination of the questions involved without awaiting the
> final determination of the action.

SDCL 23A-32-12 (emphasis added). E.H. acknowledges that this statute refers only to "the state or the defendant" being permitted to petition for a discretionary appeal. However, she notes that the State joined her petition. And although the State's filing was submitted after the ten-day timeframe required by SDCL 15-26A-13, E.H. argues that appellate jurisdiction exists nonetheless because SDCL 15-26A-13 is not a jurisdictional prescription enacted by the Legislature.[6]

[¶25.] In particular, E.H. notes that because SDCL 15-26A-13 is a court rule, this Court can, under SDCL 15-26A-92, waive the time for filing the petition for good cause shown.[7] *See* SDCL 15-26A-92 (providing that on a showing of good

---

6. SDCL 23A-32-12 directs that the procedure for petitioning for appeals under this statute shall be as set forth in SDCL 15-26A-13, which provides, in relevant part:

   > An appeal from an intermediate order made before trial . . . may be sought by filing a petition for permission to appeal, together with proof of service thereof upon all other parties to the action in circuit court, with the clerk of the Supreme Court within ten days after notice of entry of such order.

7. In arguing that the State's untimely filing does not strip this Court of its jurisdiction to hear the case, E.H. cites the United States Supreme Court's decision in *Hamer v. Neighborhood Housing Services of Chicago*, 583 U.S. 17, 138 S. Ct. 13, 199 L. Ed. 2d 249 (2017), which noted a distinction between jurisdictional limits and court rules. The Court in *Hamer* explained that time allowances to file for appeal are "jurisdictional only if Congress sets the time," whereas time limits set by a court are "mandatory claim-processing rule[s]." *Id.* at 19, 138 S. Ct. at 17. In making this distinction, the Court held that while "[f]ailure to comply with a jurisdiction prescription . . . deprives a court of adjudicatory authority over the case," court-made rules, on the other hand, are "less stern," and "may be waived or forfeited." *Id.* at 20, 138 S. Ct. at 17.

cause the Court may "extend the time prescribed by this chapter for doing any act or may permit an act to be done after the expiration of such time").[8] In regard to good cause, E.H. notes that she relied on the *Milstead* cases to exercise her appellate rights by filing a petition for a discretionary appeal just as Sheriff Milstead did and this Court did not note any jurisdictional issues in those cases. She also relies on *City of Rapid City v. State*, a case in which the appellant, like E.H., relied on this Court's prior cases when determining how to seek appellate review, and this Court treated the appellant's filing as sufficient even though it ultimately concluded that appeals must be brought in a different manner. 279 N.W.2d 165, 166 (S.D. 1979) (applying prospectively the determination that an appeal from a decision on venue must be appealed via a petition for discretionary appeal, not via a notice of appeal). Although we agree that the approach taken in *City of Rapid City* may be warranted here, we conclude for the reasons discussed below that the proper route for alleged victims to exercise their constitutional right to appeal is under SDCL 15-26A-3(4).

---

8. The Waldners contend that SDCL 15-26A-92 does not support E.H.'s waiver argument because the last clause of the statute provides that "the Supreme Court may not enlarge the time for filing or serving a notice of appeal." They further rely on this Court's holding in *State v. Mulligan* wherein we stated that the time requirement in SDCL 15-26A-13 is mandatory and if it is not met, it deprives the Court of appellate jurisdiction. 2005 S.D. 50, ¶ 5, 696 N.W.2d 167, 169. In response, E.H. notes that SDCL 15-26A-92, which was not mentioned or considered in *Mulligan*, only precludes the Court from extending the time for filing a notice of appeal. She maintains it does not preclude the Court from extending the time for filing a petition for discretionary appeal.

> c. *Appeal as a matter of right under SDCL 15-26A-3(4)*

[¶26.]       The State argues that this Court has jurisdiction to hear this appeal under SDCL 15-26A-3(4) because, in its view, the circuit court's decision denying E.H.'s motion to quash constitutes a "final order affecting a substantial right, made in [a] special proceeding[ ]." As support, the State directs this Court to *In re Essential Witness* and our conclusion that an order entered in a proceeding to summon a witness to testify in an out-of-state criminal proceeding constitutes a "'final order affecting a substantial right, made in special proceedings' under SDCL 15-26A-3(4)." 2018 S.D. 16, ¶ 11, 908 N.W.2d 160, 165.

[¶27.]       In *In re Essential Witness*, we first examined the nature of a proceeding commenced pursuant to the procedures in SDCL 23A-14-14 through 23A-14-18 to obtain an order from the circuit court summoning witnesses within South Dakota to appear and testify in a criminal proceeding in Minnesota. *Id.* We noted that "the proceedings do not involve the arrest, charge, or punishment of an individual for a public offense" and that the circuit court's determinations in these proceedings "do not implicate the resolution of a criminal charge." *Id.* We therefore determined that such a proceeding, ancillary to the criminal proceeding, was civil in nature. We further concluded that we had jurisdiction to hear the appeal under SDCL 15-26A-3(4). *Id.*

[¶28.]       Although *In re Essential Witness* is not directly on point because it concerned a separate action outside a pending criminal case, the rationale discussed in that case is instructive here. E.H., akin to the appellants in *In re Essential Witness*, is not a party to the criminal proceeding; thus, the proceeding on E.H.'s

motion to quash is ancillary to the criminal proceeding. Also, as with the proceeding to summon a witness, a proceeding on a motion to quash does not "involve the arrest, charge, or punishment of an individual for a public offense." *See id.* Further, the proceeding on E.H.'s motion to quash does "not implicate the resolution of a criminal charge." *See id.* Thus, the circuit court's order denying E.H.'s motion to quash is civil in nature similar to the proceeding in *In re Essential Witness.*

[¶29.] We further conclude that the circuit court's decision denying E.H.'s motion to quash was made in a special proceeding. We have recognized that "[t]he design of [SDCL 15-26A-3(4)] was very evidently to secure an aggrieved party a review of such final orders, affecting substantial rights, as could not be considered on an appeal from the judgment itself."[9] *Wilge v. Cropp*, 74 S.D. 511, 514, 54 N.W.2d 568, 569 (1952). Here, the nature of E.H.'s constitutional right to privacy is such that it cannot be effectively asserted or enforced after a judgment. Even if the State or E.H. could assert E.H.'s rights via a notice of review in an appeal from a judgment after the Waldners' trial, by that time, E.H.'s diaries and/or journals would have been reviewed by the circuit court and possibly disclosed to the State and defense, essentially rendering her motion to quash moot.

---

9. The State cites two additional cases involving other matters ancillary to a criminal proceeding to support its assertion that a hearing pertaining to a subpoena issued pursuant to SDCL 23A-14-5 is a special proceeding. *See State v. Kieffer*, 45 S.D. 288, 187 N.W. 164, 166 (1922) (noting that proceedings for search warrants are special proceedings and "in no sense 'criminal actions'"); *In re Implicated Individual*, 2021 S.D. 61, ¶ 10 n.7, 966 N.W.2d 578, 582 n.7 (concluding that an appeal from a ruling unsealing a search warrant could be brought under SDCL 15-26A-3(4) as an appeal of a final order affecting a substantial right made in a special proceeding).

-15-

[¶30.]    The circuit court's denial of E.H.'s motion to quash the subpoena duces tecum also affected E.H.'s substantial rights, in particular, her constitutional right to privacy and her right to refuse discovery requests under Marsy's Law. Further, the court's decision was final because, although the court indicated it would consider whether and to what extent any documents produced would be disclosed to the State and the defense, the court's order directing E.H. to produce the documents left nothing to be determined as it pertained to E.H.'s motion to quash the subpoena.[10] *See In re Implicated Individual*, 2021 S.D. 61, ¶ 10 n.7, 966 N.W.2d 578, 582 n.7 (concluding that the circuit court's orders were final orders made in a special proceeding because the orders finally determined the question at issue).

[¶31.]    For these reasons, we conclude the circuit court's order denying E.H.'s motion to quash was a "final order affecting a substantial right, made in [a] special proceeding[.]" SDCL 15-26A-3(4). Thus, it was appealable as a matter of right.

[¶32.]    However, we must still address the fact that an appeal pursuant to SDCL 15-26A-3(4) is governed by the procedural requirements in SDCL 15-26A-4. Under that statute, "[b]efore the expiration of the time to appeal, appellant shall file the notice of appeal and docketing statement with the clerk of the trial court in

---

10.    On this issue, E.H. and the State note that recognizing an appeal of right from a final order alleged to have violated Marsy's Law would ensure that victims' rights "are protected in a manner no less vigorous than the protections afforded to criminal defendants[.]" S.D. Const. art. VI, § 29. E.H. argues that just as a criminal defendant would be able to appeal as a matter of right from a final judgment if the circuit court had instead *granted* E.H.'s motion to quash, she should be afforded this same opportunity to appeal, as a matter of right, the order *denying* her motion to quash. E.H. also makes a fair point that the State may not always be in lockstep with the victim. Thus, a victim needs to have an independent right to pursue enforcement of these constitutional provisions.

which the judgment or order was entered." E.H. did not file a notice of appeal with the circuit court, as required by this statute. Instead, she filed a petition for discretionary appeal with this Court—the same procedure employed by the third party in the *Milstead* cases. Her reliance on the *Milstead* cases is understandable given that no jurisdictional issues were raised by the parties or noted by this Court in these cases.

[¶33.] As E.H. noted, this Court has previously elected to treat an improper filing as invoking this Court's jurisdiction when the appellant relied on our prior decisions in determining the proper manner to bring an appeal. *See City of Rapid City*, 279 N.W.2d at 166 (electing to treat the State's notice of appeal in the case at hand as a petition for intermediate appeal and allowing ten days to file a conforming petition with the Supreme Court clerk). While we have the opposite scenario here because E.H. filed a petition with the Supreme Court rather than a notice of appeal with the circuit court, E.H.'s use of a petition for discretionary appeal presents less of an impediment than the appellant's use of a notice of appeal instead of a petition in the *City of Rapid City* case.

[¶34.] First, there is no dispute that E.H. filed her petition within the timeframe required for notices of appeal under SDCL 15-26A-6 and that she served it on the required parties. Second, although the document E.H. filed was captioned as a petition, it no doubt contained more information than that required in a notice of appeal. *Compare* SDCL 15-26A-14 (setting forth the detailed contents required in a petition seeking a discretionary appeal), *with* SDCL 15-26A-4(1) (requiring only that a notice of appeal specify the party taking the appeal, the judgment or order

-17-

appealed from, and that it be signed by the appellant or his or her attorney). Therefore, we deem E.H.'s petition sufficient to serve as a notice of appeal. This determination is particularly warranted in light of E.H.'s reliance on the *Milstead* cases and because we have not, prior to the current appeal, addressed the proper procedure for a victim to appeal an alleged violation of Marsy's Law.

[¶35.]        Moreover, although SDCL 15-26A-4(4) provides that the notice of appeal be filed with the circuit court and E.H.'s filing was with this Court, SDCL 15-26A-4 further provides that the "[f]ailure of an appellant to take any step other than timely service and filing of a notice of appeal does not affect the validity of the appeal, but is ground only for such action as the Supreme Court deems appropriate[.]" This language identifying the failures that affect the validity of an appeal does not refer to the *location* of the filing. Therefore, we have discretion to determine whether a filing with the wrong entity warrants a dismissal. Under the unique circumstances of this case, we do not believe a dismissal would be appropriate. As such, we conclude we have jurisdiction to hear this appeal. Going forward, individuals exercising the right to appeal under Marsy's Law should follow the requirements set forth in SDCL 15-26A-4 through 15-26A-6 for appeals permitted by SDCL 15-26A-3.

### 2. *Whether the circuit court erred by requiring E.H. to produce her diaries and journals.*

#### a. *Waiver*

[¶36.] Prior to determining the nature and scope of E.H.'s asserted right to privacy, we must first address the Waldners' claim that E.H. waived her right to refuse to produce her diaries and journals either expressly or by her actions. This claim is based on the fact that during the investigation into the allegations against the Waldners, E.H. disclosed to law enforcement that she had made journal entries following the alleged misconduct by the Waldners. E.H. provided the journal containing this information to Adam. With E.H.'s consent, Adam and Levi provided it to law enforcement. These journal entries were then disclosed to the Waldners as part of the State's discovery.

[¶37.] The Waldners rely on *Karlen*, 1999 S.D. 12, 589 N.W.2d 594, to support their assertion that E.H. waived her right to privacy. Although they acknowledge that, unlike the victim in *Karlen*, E.H. is not asserting a statutory privilege, they nevertheless contend *Karlen* "supports the concept that once a person discloses information they deem personal or private, such action constitutes a waiver of any right to further maintain said information confidential in a criminal prosecution." They contend that E.H.'s disclosure of one of her diaries to law enforcement is like the disclosures of the victim in *Karlen* whose privileged communications with his counselor were deemed waived.

[¶38.] In *Karlen*, the defendant was convicted of multiple counts of rape, sexual contact without consent, and distribution of a substance with potential for abuse. The defendant issued a subpoena duces tecum to obtain the victim's

-19-

counseling records but the circuit court granted the victim's motion to quash and denied an in-camera review of the documents. On appeal, this Court reversed, and in doing so, applied SDCL 19-13-26, a statutory exception deeming privileges conferred in SDCL chapter 19-13 to be waived under certain circumstances. *Id.* ¶ 32, 589 N.W.2d at 601. The Court determined the victim had waived his privilege to keep such records confidential by disclosing some of the information to several other individuals. *Id.* Because the statutory waivers applied in *Karlen* are not applicable to E.H.'s constitutional right to privacy, the Waldners' reliance on *Karlen* to support their waiver argument here is misplaced.

[¶39.] Although the circuit court also relied on *Karlen*, it appears to have done so for a different purpose. The circuit court's conclusions of law recognized that "[a] person may waive any statutory or constitutional right they may have and such a waiver may be made either orally, in writing, or by the person's actions and conduct." Notably, however, the circuit court did not make a determination whether E.H. waived her right to privacy. Instead, the court concluded, based on *Karlen*, that private or confidential information could be disclosed in a manner in which "the privacy or confidential right may be protected." It thus appears the court believed it did not need to determine whether E.H. waived her rights prior to ordering the disclosure of the documents to the court for an in-camera review.

[¶40.] To the extent the circuit court relied on *Karlen* for this premise, such reliance is misplaced. It was only *after* this Court determined that the victim in *Karlen* had waived his privilege in his counseling records that the Court went on to discuss whether the trial court's error in refusing to allow inspection of the records

was harmless. *Id.* ¶¶ 32, 35, 589 N.W.2d at 601–02. After finding it was not, the Court then directed an in-camera review as a method of balancing the tension that still exists "between the rights of the accused and the confidences of the patient." *Id.* ¶ 45, 589 N.W.2d at 605. Thus, while the protection afforded by an in-camera review is an appropriate way to balance these competing rights and interests, this does not supplant the need to first determine if there is an *unwaived* right or privilege at stake and whether it can be overcome, before ordering the disclosure of the documents to *anyone*, including the court.

[¶41.] As to whether E.H. waived her right to privacy, we must apply the law governing waivers of constitutional rights. A waiver of a constitutional right must be voluntary, knowing, and intelligent. *See, e.g.*, *State v. Larson*, 2022 S.D. 58, ¶ 28, 980 N.W.2d 922, 930; *State v. Hauge*, 2019 S.D. 45, ¶ 12, 932 N.W.2d 165, 170. Also, Marsy's Law provides that, with regard to discovery, interviews, or depositions, victims may "set reasonable conditions on the conduct of any such interaction to which the victim consents." S.D. Const. art. VI, § 29(6). As such, the Waldners would not only have to prove E.H.'s alleged waiver was voluntary, knowing, and intelligent, but also that her decision to relinquish only the one journal was unreasonable.

[¶42.] While E.H. agreed to give law enforcement the journal in which she described the acts forming the basis for the current charges against the Waldners, there is nothing in the record showing that prior to doing so, E.H. knew she had a constitutional right to privacy or that she knew she was waiving that right by relinquishing one of her journals. Yet, the Waldners assert E.H. waived her right to

privacy in all of her other diaries and journals when she wrote in the one disclosed journal, "Really, I don't care anymore who reads it. I don't care what they think." However, the preceding statements in this journal entry reveal that the "it" she was referring to was a "purple notebook" containing her poems which she described as "very depressing and disturbing." Also, the above-quoted statement about E.H. not caring who read her poems related to a suggestion by Levi that she should give this notebook to *his mom* to read. Regardless of any implications that can be drawn from this particular statement, there is no evidence that E.H. knowingly and intelligently waived her right to refuse disclosure of any other remaining diaries or journals. Furthermore, as noted under Article VI, § 29(6), E.H. had a right to put reasonable conditions on any information she disclosed. *See In re B.H.*, 946 N.W.2d 860, 869–70 (Minn. 2020) (concluding that a victim's offer of a "limited amount of data directly related to the alleged assault" did not constitute a knowing and voluntary waiver to all other data on her phone). We conclude that E.H. did not waive her right to privacy as it relates to her other diaries and journals.

### b. *Whether a victim's right to privacy is absolute*

[¶43.] E.H. contends that her right to privacy as stated in Marsy's Law is absolute. If so, she claims she has no obligation to comply with the Waldners' subpoena. E.H. notes that the language in Marsy's Law is not conditional and does not contain any exceptions when stating that a victim has the right to refuse discovery requests. In contrast, E.H. notes that other states' versions of Marsy's Law are not written in such absolute terms. For example, Ohio's rendition of Marsy's Law expressly refers to a criminal defendant's constitutional rights,

including the right to compulsory process, as an exception to the victim's rights outlined in Marsy's Law. Ohio Const. art. I, § 10a(A)(6) (citing Ohio Const. art. I, § 10, Ohio's constitutional provision for rights of criminal defendants); *see also*, N.D. Const. art. 1, § 25(1)(f) (stating that "[n]othing in [the right to privacy] section shall abrogate a defendant's sixth amendment rights under the Constitution of the United States nor diminish the state's disclosure obligation to a defendant"); Wis. Const. art. 1, § 9m(6) (stating that "[the crime victim's rights] section is not intended and may not be interpreted to supersede a defendant's federal constitutional rights or to afford party status in a proceeding to any victim").

[¶44.]     But an absence of express exceptions to a privilege or constitutional right may not insulate E.H. from complying with a Rule 17(c) subpoena duces tecum. A similar argument, although not based on an express constitutional right like those at issue here, was made in *Nixon*. In *Nixon*, the special prosecutor issued a Rule 17(c) third-party subpoena duces tecum directing the President to produce tape recordings and documents concerning conversations between the President and his aides and advisors. 418 U.S. at 686, 94 S. Ct. at 3096. Nixon, an unindicted coconspirator, filed a special appearance in the proceeding and moved to quash the subpoena. Among other arguments, Nixon asserted "claims of absolute executive privilege." *Id.* at 686, 94 S. Ct. at 3096. The district court denied Nixon's motion to quash.

[¶45.]     The case was heard by the United States Supreme Court after the Court granted a petition and a cross-petition for a writ of certiorari. On appeal, Nixon presented two arguments to support his claim of absolute privilege: (1) "the

valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties" which derives from the exercise of the President's Article II powers; and (2) the need for "independence of the Executive Branch within its own sphere" as required under the doctrine of separation of powers. *Id.* at 705–06, 94 S. Ct. at 3106.

[¶46.] In assessing Nixon's arguments, the Court determined that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Id.* at 706, 94 S. Ct. at 3106. The Court instead concluded that "the legitimate needs of the judicial process may outweigh Presidential privilege" and thus deemed this privilege, although "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution[,]" to be a "presumptive privilege." *Id.* at 707–08, 94 S. Ct. at 3107. Ultimately, the Court held that a president's claim of privilege "based only on the generalized interest in confidentiality, . . . cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice." *Id.* at 713, 94 S. Ct. at 3110.

[¶47.] Although E.H.'s right to privacy is not just "rooted" in the South Dakota Constitution but is instead expressly recognized in a constitutional amendment, her appeal nevertheless involves competing constitutional interests of adverse parties in a criminal prosecution similar to those at stake in *Nixon*. Thus, the question before us in this appeal is not one in which we can simply apply the "basic [tenet] 'of American jurisprudence that a statutory provision never be

allowed to trump a Constitutional right.'" *Milstead II*, 2016 S.D. 56, ¶ 10, 883 N.W.2d at 730. Rather, we must carefully balance the constitutional rights of both E.H. and the Waldners. In doing so, we note that although Marsy's Law further commands "that victims' rights and interests are protected in a manner no less vigorous than the protections afforded to criminal defendants[,]" S.D. Const. art. VI, § 29, it does not say that a victim's rights *trump* the equally important constitutional rights of criminal defendants.[11]

[¶48.]        Further, to read a victim's right of privacy under the State constitution as absolute, or superior to the rights of a defendant, would at some point infringe upon a defendant's federal due process right to defend against a charge. "[D]ue process is in essence the right of a fair opportunity to defend against the accusations." *State v. Packed*, 2007 S.D. 75, ¶ 23, 736 N.W.2d 851, 859 (citations omitted). As noted in *Nixon*, a "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." 418 U.S. at 713, 94 S. Ct. at 3110.

---

11. Other jurisdictions that have adopted Marsy's Law have addressed the effect of the "no less vigorous than protections afforded to criminal defendants" language. The Court of Appeals of Ohio, when balancing the competing rights, held that a victim's right to refuse discovery "must be weighed against a criminal defendant's rights to due process, to confront witness[es], to have compulsory process to obtain evidence, and to effective assistance of counsel[.]" *State ex rel. Thomas v. McGinty*, 137 N.E.3d 1278, 1289 (Ohio Ct. App. 2019). However, we acknowledge that, unlike our version of Marsy's Law, Ohio's law does have express exceptions to a crime victim's right to refuse discovery. *See also L.T.*, 296 So. 3d at 495 (noting, generally, that the overall provisions in Marsy's Law "call for a careful balance of the rights of the defendant and those of the victim . . . without impacting the basic constitutional foundations of the criminal justice system").

[¶49.]     Here, the circuit court balanced the competing interests of E.H. and the Waldners and concluded that the Waldners' constitutional rights outweighed E.H.'s right to privacy. In reaching this conclusion, the court relied on *Karlen*, which, in turn, quoted language from *Nixon* supporting its determination:

> The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or the defense . . . . Whatever [the privileges'] origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.

*Karlen*, 1999 S.D. 12, ¶ 34, 589 N.W.2d at 602 (quoting *Nixon*, 418 U.S. at 709–10, 94 S. Ct. at 3108) (alteration and omission in original). The Court in *Nixon* observed that the right to production of evidence for a criminal trial "has constitutional dimensions" stemming from the Sixth Amendment right of a defendant to confront witnesses against him and "to have compulsory process to obtain witnesses in his favor," and from the Fifth Amendment guarantee "that no person shall be deprived of liberty without due process of law." 418 U.S. at 711, 94 S. Ct. at 3109. In order to accomplish "the manifest duty of the courts to vindicate those guarantees," the Court noted that "it is essential that all relevant and admissible evidence be produced." *Id.*

[¶50.]     In light of this Court's past reliance on *Nixon's* analysis of competing rights and interests, which applies broadly to various claimed privileges, including those of constitutional origin, we conclude the right to privacy provided in Marsy's Law is not so absolute to preclude *in all instances* a defendant's right to compel the

production of relevant and admissible evidence via a Rule 17(c) subpoena. However, this determination does not resolve the matter before us because not all subpoenas issued under Rule 17(c) are enforceable. We must next examine whether the Waldners' subpoena met the requirements set forth in *Nixon* to overcome E.H.'s motion to quash.

### c. Whether the circuit court erred by not applying the *Nixon* factors

[¶51.] "Ordinarily, '[w]e review the [circuit] court's rulings on discovery matters under an abuse of discretion standard.'" *Milstead II*, 2016 S.D. 56, ¶ 7, 883 N.W.2d at 729 (citation omitted). "However, the question whether the circuit court erred when it interpreted SDCL 23A-14-5 to permit discovery raises a question of statutory interpretation and application, which we review de novo." *Id.*

[¶52.] Like the Waldners' subpoena duces tecum, the challenged subpoena in *Nixon* was issued under Rule 17(c) of the Federal Rules of Criminal Procedure (the federal counterpart to SDCL 23A-14-5), "which governs the issuance of subpoenas duces tecum in federal criminal proceedings." 418 U.S. at 697–98, 94 S. Ct. at 3102. In its decision, the Supreme Court developed a specific test to determine the validity of Rule 17(c) subpoenas. *Id.* at 700, 94 S. Ct. at 3103. The Court noted that while "[e]nforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court," *id.* at 702, 94 S. Ct. at 3104, that discretion is not without limit. The *Nixon* Court held that a party seeking to require pretrial production of evidence in this manner must "clear three hurdles" by showing "(1) relevancy; (2) admissibility; [and] (3) specificity" with regard to the information requested. *Id.* at 700, 94 S. Ct. at 3103.

[¶53.] This Court adopted the *Nixon* test while analyzing a Rule 17(c) subpoena duces tecum issued pursuant to SDCL 23A-14-5 in *Milstead II*, 2016 S.D. 56, ¶ 20, 883 N.W.2d at 733–34.[12] Thus, the circuit court erred here by neglecting to apply the *Nixon* factors when denying E.H.'s motion to quash the Waldners' subpoena duces tecum. While the circuit court may have discretion in applying the *Nixon* factors to the particular facts or circumstances of the case, the legal parameters for those factors are defined by this Court.

[¶54.] As to the first factor, i.e., relevancy, we have stated that evidence is relevant if: "(a) It has any tendency to make a fact more or less probable than it would be without the evidence; and (b) The fact is of consequence in determining the action." *Milstead II*, 2016 S.D. 56, ¶ 22, 883 N.W.2d at 734 (quoting SDCL 19-

---

12. To the extent the Waldners are suggesting that *Karlen* has any bearing on whether the *Nixon* factors must be applied, this suggestion is misplaced. We specifically noted in *Milstead II* that although *Karlen* involved a subpoena duces tecum issued in a criminal case, the Court did not address "the parameters for discovery of documents under SDCL 23A-14-5 (Rule 17(c))" because the issue was not raised by the parties. 2016 S.D. 56, ¶ 15, 883 N.W.2d at 732. We further reject the Waldners' argument that the *Nixon* factors need not be applied here because, in their view, Marsy's Law does not give a victim the right to refuse a court order (i.e., a subpoena duces tecum), as well as their suggestion that the *Nixon* factors need only be applied when the material subpoenaed is subject to a statutory privilege. Neither premise is sound. In fact, SDCL 19-19-501 recognizes that constitutional and statutory provisions, along with Court rules, may allow the precise privileges claimed by E.H. to be asserted. Relevant here, this statute provides:

> Except as otherwise provided by constitution or statute or by this chapter or other rules promulgated by the Supreme Court of this State, no person has a privilege to:
> . . .
> (2) Refuse to disclose any matter;
> (3) Refuse to produce any object or writing; or
> (4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

19-401). Although relevancy is generally a low hurdle to clear, there must nonetheless be a showing that the documents sought are significant to deciding the issue before the factfinder.

[¶55.] For instance, in *Milstead II*, the defendant was attempting to subpoena "[a]ll disciplinary records/reports, disciplinary actions or complaints" of three law enforcement officers involved in his arrest. *Id.* ¶ 2, 883 N.W.2d at 728. On appeal, this Court determined that because the defendant sought to obtain confidential personnel records, he had to "establish a factual predicate showing that it is reasonably likely that the requested file will bear information both relevant and material to his defense." *Id.* ¶ 25, 883 N.W.2d at 735. We concluded that the defendant's showing of relevance [was] lacking" and that he only subpoenaed the records because "the requested information in the personnel records might produce information useful to impeach his credibility." *Id.* ¶ 26. We also noted that "[i]t is well established . . . that 'the need for evidence to impeach witnesses is [generally] insufficient to require its production in advance of trial.'" *Id.* (quoting *Nixon*, 418 U.S. at 701, 94 S. Ct. at 3104) (second alteration in original).

[¶56.] Here, the Waldners assert two bases for issuing the subpoena. They assert that E.H.'s mental health is at issue given other disclosures in her medical and mental health records, and that the requested diaries or journals may contain additional information relevant to her ability to reliably recall and recount events. The circuit court found that "E.H. appears to suffer from mental health conditions which may have an impact on her general credibility" and that "[i]t appears that the journals may shed light on E.H.'s general credibility and the search for the truth in

this prosecution." But based on prior decisions from the United States Supreme Court and this Court, the Waldners' assertions and the court's finding that the journals "may" contain additional information relating to E.H.'s *general credibility* are insufficient to establish the necessary relevancy.

[¶57.]    However, the Waldners also suggest the reference, in the journal E.H. did disclose, to a "purple notebook" indicates that she has other journals that may contain further information about her allegations against the Waldners. Prior to turning over this journal, E.H. told law enforcement she made journal entries detailing the events and her experiences involving her allegations against the Waldners, and the circuit court found that "the one journal produced discloses events which are relevant to the allegations against the Defendants as E.H. described the criminal conduct perpetrated against her[.]" We agree that although such case-specific information, if it exists in other journals, would meet the relevancy test, E.H.'s reference to the contents of a purple notebook did not refer in any respect to the Waldners. Instead, she referred only to the purple notebook containing depressing and disturbing poems she had written. Nonetheless, even if there is a sufficient factual predicate or showing that it is reasonably likely that other diaries or journals may contain relevant and admissible evidence, the Waldners' subpoena unquestionably fails to meet the specificity factor identified in *Nixon*.

[¶58.]    This Court has recognized that, "[o]f the three requirements set forth in *Nixon*, '[s]pecificity is the hurdle on which many subpoena requests stumble.'" *Milstead II*, 2016 S.D. 56, ¶ 27, 883 N.W.2d at 736 (quoting *United States v.*

*Ruedlinger*, 172 F.R.D. 453, 456 (D. Kan. 1997)) (second alteration in original). "The requirement of specificity 'ensures that the subpoenas are used only to secure for trial certain documents or *sharply defined groups of documents*.'" *Id.* ¶ 27, 883 N.W.2d at 735 (emphasis added). The main concern is that Rule 17(c) subpoenas are not "being used as a 'fishing expedition to see what may turn up.'" *Id.* ¶ 27, 883 N.W.2d at 736 (citation omitted).

[¶59.] The Waldners' subpoena does not meet the specificity requirements required under *Nixon*. "The specificity and relevance elements require more than the title of a document and conjecture as to its contents." *Id.* ¶ 29. Further, we have said that use of the word "all," and other similarly overbroad language, "does little to narrow the scope of the subpoena[,]" and such language "could require production of completely irrelevant materials[,] and falls short of the specificity necessary for production." *Id.* ¶ 28. Here, the only other document referenced in the current record is the "purple notebook" containing poems that E.H. mentioned in the disclosed journal. But the Waldners' subpoena requests *all* journals and/or diaries written by E.H. from January 1, 2010, to the present. Importantly, the charged conduct was alleged to have taken place in 2019 and 2020.

[¶60.] Similar to our conclusion in *Milstead II*, where the subpoena sought "all disciplinary records" and did not limit the requested documents to a particular relevant time frame, the "all" language here resembles "a general, non-specific fishing expedition," and would in and of itself invalidate the Waldners' subpoena.[13]

---

13. The State also asserts that the Waldners "have not shown that any information in the journals would be admissible," claiming primarily that

(continued . . .)

*See id.* ¶¶ 26–28, 883 N.W.2d at 735–36.  Therefore, the circuit court erred by not granting E.H.'s motion to quash.  We reverse the court's order denying the motion to quash and remand for further proceedings consistent with this opinion.

[¶61.]      Reversed and remanded.

[¶62.]      JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.

---

(. . . continued)

> "the information within [the journals] would constitute impermissible hearsay and could be precluded under SDCL 19-19-412 [the Rape Shield law]."  Given our determination that the specificity factor has not been met, we need not resolve this issue.  However, we note that one of the circuit court's findings of fact states that E.H. has "made incriminating statements about other persons who have perpetrated sexual crimes against her."  It is not clear whether the court was referring to statements E.H. made in the disclosed journal.  In cases involving alleged sexual misconduct, a court evaluating a Rule 17(c) subpoena must be cognizant of the general inadmissibility of other sexual behavior by a victim under SDCL 19-19-412.